This appeal is from a tax levied on the transfer of property by the death and last will and testament of George J. Gould.
The will of Mr. Gould set aside $4,000,000 in trust for his widow for life, over to their three children for life, remainder to their issue. The residue of the estate was given in trust for the testator's ten children for life (he had seven by his first wife), each an equal share, remainder to their issue. The gross estate approximated $15,000,000. Jay Gould, his father, left an estate of $80,000,000 in trust for his six children for life, each an equal share, remainder to their issue. Mr. Gould, with two of his brothers and a sister, co-trustees, was charged in the courts of New York with mismanagement of the trusts created by his father, which finally terminated in a referee's report surcharging them with upwards of $50,000,000, and had the report been sustained it might have resulted in wiping out Mr. Gould's estate. A settlement was made, the four trustees agreeing to pay to the Jay Gould estate $17,500,000. Of this sum Mr. Gould's estate was to pay $5,442,392.55 as its share of the damage. Two million dollars of the $17,500,000 was allocated to the trust created for Mr. Gould's children in remainder. The compromise agreement was conditioned upon its approval by the seven children, the widow and her three children with the sanction of this court. The seven children were unwilling that the $5,442,392.55 to be paid by their father's estate should fall entirely upon the residue unless the widow and her three children would yield $1,825,000 of their $4,000,000 trust, of which $1,525,000 was to be equally divided among the seven — to each $277,857.14. The remaining $300,000 was to be held in trust for the widow's three children in equal shares. It was so agreed and the money was paid over. *Page 600 
Thereupon the comptroller levied an assessment upon $277,857.14 against each of the seven children upon the theory that the payment out of the widow's trust was but an adjustment of the burdens of the $5,442,392.55 among the beneficiaries of Mr. Gould's will and effected a distribution of his estate to that extent contrary to the terms of his will. The seven children claim the sums were paid to them in part reimbursement for the loss of their trust under their grandfather's will.
The only evidence of the arrangement is to be found in the contract. That, after referring to the peril of the widow's trust and the residue of the estate of Mr. Gould from the impending judgment in the Jay Gould estate litigation, and to the negotiations which resulted in the compromise of that litigation recites that:
"The performance of said stipulation for compromise would definitely determine the volume of the assets of the estate of George J. Gould, and all the stipulated payments required to be made from the estate but for this agreement would be made from the residuary estate, which would also insure the integrity of said preferential trust in which the three and Lady Dunsford (the widow) are pecuniarily interested.
"The seven are willing to sign such stipulation on condition that an equitable adjustment be made, as herein provided, of the loss which would otherwise fall exclusively on the said residuary, and which would result from making the payments called for by said stipulation, * * *
"In consideration of the foregoing * * * the undersigned * * * agree:
"The seven, the three and Lady Dunsford unite in requesting the executors to execute said stipulation for compromise.
"If and when the stipulation for compromise and this agreement shall have been approved by the court of chancery of New Jersey, and the stipulation for compromise by said supreme court and said supreme court shall have authorized the dismissal of the said appeal of the three, the executors will pay out of the assets of the estate of George Jay Gould in their hands, and charge against the capital of the preferential trust, and distribute equally among the seven as soon as may be after said compromise payments shall have been made, the sum of $1,525,000."
Plainly, the money was to be paid to the seven to offset protanto their loss in the residue of their father's estate *Page 601 
and not for the damage suffered to their inheritance under their grandfather's will. Their contention that the state is not entitled to a transfer tax because the payment of $1,525,000 out of the widow's trust reduced by that sum the inheritable property of Mr. Gould upon the theory that it was made in discharge of an obligation of his estate is not admissible. The tax, however, should not have been levied against them, and for this reason: The tax is imposable only upon the transfer of the property by will. The thing taxable was the transfer by the will of the $4,000,000 trust fund for the widow and her children. The seven took $1,525,000 of the widow's trust not by the will of their father, but contrary to it, by transfer from the widow and her children. That transfer was not taxable. That she and they chose to bargain with the seven to surrender a portion of their trust to induce them to subject their inheritance under their father's will to the burden of the $5,442,392.55 due the Jay Gould estate, and to reimburse them for the consequent depreciation of their shares of that inheritance is wholly irrelevant to the power to levy a tax upon the transfer of property by death. It is true that a transfer tax is measured by the net amount passing to the beneficiary; and that rule would be satisfied by levying the tax against the widow's trust as an entirety for it was transferred from the dead to the living in its entirety; in fact, the contract presupposes its integrity in providing that the $1,525,000 to be paid the seven shall be charged "against the capital of the preferential trust." It cannot escape tax by the beneficiaries making part of it over to others any more than if they had made it over to strangers. It may be entirely equitable, as the appellants submit, that the widow's trust should not be taxed for more than the reduced amount of the trust, but that is an equity between the seven and the widow and her children with which the state has no concern. The adjustment of the equities must be left to them — to their contract or conscience. At all events the state is not interested, and it was not the privilege of the comptroller to take notice of the manipulation of the property by the beneficiaries as between themselves. *Page 602 
His duty began and ended with levying the tax imposed by the statute on the transfer of property by the will of Mr. Gould. The assessment will be set aside.
The comptroller assessed, as against the widow, a gift of $1,000,000 in United States liberty bonds made by Mr. Gould to her March 21st, 1923, within two months of his death, May 16th, 1923. The gift was of a material part of his estate (the estate was finally reduced to an assessable value of $6,500,000). Under the statute the gift is presumed to have been made in contemplation of death and the proofs show beyond peradventure that it was actually made in contemplation of death and in the nature of a final disposition. At the time of the gift Mr. Gould was, and for sometime previous, had been room-fast, in the constant care of nurses and physicians, in the last stages of the disease from which he died, arterio-sclerosis, and attendant high blood pressure, heart and kidney trouble. His condition was precarious and he realized that his days were few. A trust had been established for his wife and their children with the Commercial Trust Company of Jersey City and S. Nielson Rice as trustees shortly before December, 1922. To this trust was added the gift, by letter communication to the trust company, March 21st, 1923, in which Mr. Gould said: "Please deposit the $1,000,000 par value U.S. Liberty Loan 3 1/2, which you are holding for me, in the trust for Mrs. Guinivere S. Gould, of which you and S. Nielson Rice are trustees." Mr. Rice, his confidential secretary, had arrived from New York at his home in the south of France a few days before the letter was sent and at that time Mr. Gould asked for his will and had it read to him. The two discussed the gift and Mr. Rice advised against it, saying he "thought it would be a mistake in view of what he had already given," but Mr. Gould persisted. When he signed the letter he was so feeble his hand had to be guided. It was the fulfillment of his aim that "Mrs. Gould and the children [their children] must be taken care of," expressed in a letter to his secretary four months before, when he was harrassed by the New York suit and fears of its consequences. The tax will stand. *Page 603 
The comptroller assessed five thousand four hundred and twenty-eight shares of stock of the Consolidated Coal Company of St. Louis at $70 per share. The appellants protest that their fair market value was $60, but they conceded that $65 per share would not be objectionable. Sales of this stock were few; the prices equalled or exceeded the rate fixed and the comptroller took them into consideration. He also examined into the book values which equal $127.76 per share. Standard, current financial reports were consulted and information from responsible sources was procured. All available sources of information were exhausted — at least the appellants point to no other. There was sufficient evidence before the comptroller to support the appraisal and there is nothing in the record from which it may be adjudged that he erred. In fact, nothing was offered by the appellants upon which the court could as a matter of law arrive at a different result. The tax is sustained.